[No. 14586.   Department Two.   May 8, 1918.]

MARTIN WOLDSON, *Respondent*, v. RICHMOND MINING, MILLING & REDUCING COMPANY, *Appellant*.[1]

CORPORATIONS—STOCK—OPTIONS—CONSTRUCTION. An option to buy 100,000 shares of mining stock, to be taken and paid for in such sums and amounts as may· be required in the development of the company's mine, without any limit as to time, was terminated when the mine by a discovery and shipment of ore became profitable and needed nothing for its development.

Cross-appeals from a judgment of the superior court for Spokane county, Blake, J., entered September 19, 1917, upon findings in favor of the plaintiff, in an action for specific performance, tried to the court. Reversed.

*Merritt, Lantry & Merritt* and *Graves, Kizer & Graves,* for appellant.

*Voorhees & Canfield,* for respondent.

PARKER, J.—The plaintiff, Woldson, commenced this action in the superior court for Spokane county, seeking specific performance of a contract entered into with

[1] Reported in 172 Pac. 1162.

the defendant company for the sale to him by it of 100,000 shares of its treasury stock at ten cents per share. Trial upon the merits resulted in findings and judgment in favor of the plaintiff, awarding him damages in the sum of $15,000 against the defendant, the trial court being of the opinion that, while he was entitled to recovery, he was entitled to damages only, measured by the difference between the contract and market value of the stock at the time he was entitled under the contract, as viewed by the court, to have the sale thereof consummated. From this disposition of the cause, the defendant company has appealed to this court, contending that the plaintiff is not entitled to any recovery, either by way of specific performance or damages. The plaintiff also has appealed to this court, contending that he is entitled to a more favorable judgment, but since we conclude he cannot have any recovery, we shall refer to him as respondent, and to the defendant mining company as appellant.

Appellant is a corporation organized and existing under the laws of the state of Washington, having its principal place of business in Spokane. In August, 1916, appellant owned and was engaged in developing and operating its mine known as "The Richmond Mine," which mine, it may be assumed, it has continued to own and operate ever since. On August 15, 1916, appellant had in its treasury some 300,000 shares of its capital stock which it was holding in trust for its stockholders. This stock was placed at the disposal of the officers of the corporation with a view to selling it as might become necessary to raise funds to defray the cost of the development of the mine. A by-law of the company authorized its board of directors to sell this stock as in their judgment the best interests of the company might require, at not less than ten cents per share. On August 15, 1916, the company had developed

its mine to a considerable extent.  While its develop-
ment work up to that time had uncovered some ore of
some apparent value, the policy of the company had
been to prosecute development work rather than at-
tempt to mine and market the ore already uncovered.
The company was then indebted about $3,000 for de-
velopment work.  On that day, at a meeting of the
board of directors of the company, the following pro-
ceedings were had:

"The matter of financing the further development
of the company's property was discussed, and on mo-
tion it was resolved.

"Resolved, That an option on one hundred thousand
shares of the treasury stock of the company be given to
Martin Woldson at the rate of ten cents per share, to
be taken and paid for in such sums and amounts as
may be required in the prosecution of the work of the
development of the company's property, Martin Wold-
son to have the right to throw up said option at any
time on reasonable notice so as not to leave this com-
pany in debt for any work contracted.  Stock to be
issued as each payment is made at the rate of ten cents
per share."

At that time respondent was a member of the board,
and was also the president of the company.  This reso-
lution was adopted, however, by the vote of the other
members of the board and without the necessity of re-
spondent's vote, in so far as its lawful adoption was
concerned.  This was done, however, in response to an
offer made by respondent to purchase 100,000 shares
at ten cents per share to further the development work
of the mine and to complete such purchase from time
to time as stated in the resolution.  Respondent there-
upon orally agreed to the terms of the resolution as
evidencing a contract between himself and the com-
pany.  Immediately thereafter the respondent became
the general manager of the company and its affairs,

as well as its president, having in charge the operation
and development of the mine.

About two weeks following the entering into of this
contract, work was done in the mine rendering it evi-
dent that there was valuable ore uncovered such as
would be profitable to mine and market. Thereupon,
instead of pursuing development work, respondent
caused the work to be changed to that of mining, ship-
ping and marketing the ore. This was pursued under
respondent's management of the mine with such suc-
cess that the indebtedness owing at the time of enter-
ing into contract with respondent was paid off, to-
gether with all indebtedness incurred in the mining
and marketing of ore, all of which was paid wholly
from the proceeds of the ore so mined. It thereupon
became apparent that no money was needed from other
sources in order to make the mine a profitable working
mine. At the beginning of September, 1916, this con-
dition of the mine became so apparent that the market
value of the shares of stock of the company was at
least twenty-five cents per share, and a short time
thereafter increased very much more in market value.
About this time respondent ceased to be president and
manager of the company, and thereafter, on December
6, 1916, respondent tendered to the company $10,000
as the purchase price of the sale to him of the stock
mentioned in the contract evidenced by the resolution
of August 15, 1916, and demanded the delivery of the
whole of the 100,000 shares of stock, then claiming the
right thereto under that contract. This demand the
officers of the company refused to comply with, the
board adopting a resolution in effect declaring that it
was under no further obligation under the contract
made with respondent on August 15, 1916. Up to that
time neither the corporation nor any one representing
it ever made any demand upon respondent to complete

the purchase of any portion of the stock so that the money could be used "in the prosecution of the work of development of the company's property"; nor, up to that time, did the respondent, though the president and manager of the company at all times since the making of the contract of August 15, 1916, ever tender or even suggest to the other officers of the company that he receive any portion of the 100,000 shares of stock and pay therefor, or that the money was needed for the development of the mine. Indeed, the very management of the mine by respondent himself demonstrated that no money was ever "required in the prosecution of the work of the development of the company's property" in order to make it a profitable working mine. On December 6, 1916, all of the debts and obligations of the company were paid, it had a substantial bank balance, and its mine was being profitably worked without the aid of funds other than was being produced by the mining and marketing of the ore taken therefrom. The words "development of the company's property," as used in the resolution and contract of August 15, 1916, we think plainly have reference to this particular mine. These facts, we think, are proven by the evidence all but conclusively; indeed, they are, for the most part, admitted.

This, it seems to us, is one of those cases which finds its correct determination in a plain statement of its controlling facts and has little need of argument to demonstrate what the rights of the parties are in the premises. This was not a contract for an outright, unconditional sale of stock by the company to respondent, but it was plainly a conditional sale to be consummated in part or in whole as the need for raising funds to prosecute the development of its mine might arise; nor was it an option open to acceptance by the respondent for an unlimited time in the future, though there

was no specified time for the consummation of the sale.
It seems to us unnecessary to look beyond the plain
terms of the contract and the conditions attending its
making to render it plain that the need for the money
to be derived from the purchase price of the stock was
to be the controlling fact determinative of what
amount, if any, of the hundred thousand shares of
stock should ultimately be sold to respondent. · Re-
spondent himself, by his own actions in the manage-
ment of the mine and the company's affairs, so con-
strued and acted upon the contract up until the time
for the need of the money for the purposes contem-
plated had wholly ceased. Looking to the contract and
all the surrounding circumstances, nothing could seem
plainer than that there was no intent that the contract
should have any binding force upon either the re-
spondent or appellant after the mine should become
a profitable working mine. Respondent not having
sought to consummate the purchase of any portion of
the stock under the contract until after the mine had
become a profitable working mine and the need for the
money for development work from that source had
ceased, we are of the opinion that respondent cannot
now have either specific performance of the contract
or damages. Suppose the mine had suddenly, follow-
ing the making of the contract, yielded ore worth mil-
lions, as sometimes happens in the mining world, and
the need of development money from the purchase
price of the sale of stock under respondent's contract
had thereby ceased, is it possible that respondent could
thereafter enforce the contract and acquire the stock
at the nominal price therein specified? The mere ask-
ing of such a question gives its own answer contrary to
respondent's contentions; yet the principle here con-
trolling is the same as in the supposed case. It is sug-

gested that the contract with respondent for the purchase of the stock was, in effect, a loaning of his credit to the company enabling it to proceed with the work of development. Plainly, we think, the contract had no such effect. There is no evidence that any workman or creditor ever contracted with the company relying upon or even having knowledge of this contract.

The judgment is reversed and the action dismissed. Appellant mining company shall recover costs in this court.

ELLIS, C. J., MOUNT, HOLCOMB, and CHADWICK, JJ., concur.